*702 OPINION.
Love:
These proceedings present two primary questions for our determination. They are, first, whether or not assessment and collection of the alleged deficiency for the year 1918 is barred by the statute of limitations; and, second, the fair market value, if any, of the 995 shares of its capital stock issued by the petitioner in return for Powell’s assignment of two contracts to it. In the event that our decision on the first question is adverse to the petitioner, we must also consider the alleged error in excluding from invested capital for 1918 a prorated portion of the refund of taxes for the year 1917.
Upon hearing the petitioner moved for leave to amend its pleadings to conform to proof in respect of the March 9, 1917, value of two contracts involved. Motion is granted and the pleadings will be considered as amended accordingly.
The petitioner’s income-tax return for the year 1918 was properly filed April 16, 1919. On October 23, 1925, the respondent issued a deficiency letter to the petitioner in which he determined a deficiency for the year 1918 in the amount of $6,675.40. The petitioner’s appeal with respect thereto was duly filed with the Board December 15, 1925. The deficiency had not been assessed or collected on March 6, 1928. Under section 277 (a) (3) of the Revenue Act of 1926, the time within which any deficiency in taxes for 1918 could be assessed expired (April 16, 1924) long prior to the time when the respondent issued his deficiency letter on October 23, 1925. There is no evidence of conditions which would have prevented the tolling of the statute. No deficiency for the year 1918 can be assessed or collected now. Lancaster Lens Co., 10 B. T. A. 1153; Roslyn Fuel Co., 16 B. T. A. 285; see, also, Farmers Feed Co., 10 B. T. A. 1069; Bonwit Teller & Co., 10 B. T. A. 1300; and Dunson Mills, 10 B. T. A. 1150.
To establish the value of the contracts received on March 9, 1917, in return for $99,500 par value of its capital stock, the petitioner has offered a history of the circumstances under which Edward E. Powell acquired these contracts and transferred them to it; evidence of the resale price of the coal purchased under them; expert testimony on the fair market value of Bernice screenings covered by the contracts and similar evidence of the fair market value of the contracts when acquired by it.
It appears that for several years prior to 1917 Powell had conducted experiments to develop formulas for the satisfactory use of *703 the semianthracite coal produced in the Bernice Region. After the expenditure of approximately $60,000, formulas were devised under which the coal could be used for steam purposes in competition with anthracite and bituminous coals.
Semianthracite coal was produced only in the Bernice Region and had theretofore been restricted to local markets. The coal field was a small one, in which only two large producers operated. After prolonged negotiations Powell secured from these two operators contracts (hereinafter called “ operators’ contracts ”) giving him control for five years of virtually their entire production of screenings, which is the size of semianthracite used for steam purposes.
March 9, 1917, Powell transferred the operators’ contracts to the petitioner which issued 996 shares of its capital stock for them. The formulas above mentioned were also transferred to the petitioner. By these contracts the petitioner acquired the right to purchase approximately 150,000 gross tons of Bernice screenings annually at variable base prices, plus a percentage of the price received on resale in excess of the base price. Each contract was for a term of five years subject to renewal for a like term.
Within 24 hours after acquiring the operators’ contracts the petitioner contracted to sell 100,000 gross tons annually of “.Lopez or Bernice ” screenings at $2.75 per ton f. o. b. the mines. This price was about $1.50 higher per ton than the cost of the coal to the petitioner at that time, and quite evidently permitted the petitioner a considerable profit even after the required percentage of the resale price was paid the operators. Two subsequent sales in 15,000 ton lots brought $3.75 and $4 per ton. It should be noted that the petitioner bought and sold this coal f. o. b. the mines without having to handle it at any point.
The largest of the resale contracts above described was entered into with the Powell Coal Co. In Powell Coal Co., 12 B. T. A. 492, we held that this contract had a fair market value of $25,000 to the petitioner therein on March 10, 1917.
Relying upon the facts recited, and others appearing in our findings, the petitioner contends that the operators’ contracts acquired by it had a value in excess of the par value of the stock issued for them. It claims such value for purposes of computing a deduction for exhaustion of the contracts annually over their terms. The respondent denies any value in the contracts.
The petitioner has offered the expert testimony of four men to establish the March 9, 1917, fair market value of the contracts now under discussion. Edward E. Powell, president of the petitioner and moving spirit in the whole project, testified that in his opinion the contracts were worth at least $250,000 when acquired by the *704 petitioner. A. J. Parsons, a banker of long experience, a stockholder of the petitioner and acquainted with its assets, testified that in his opinion the stock of the petitioner was worth “ more than par ” when issued. The assets at that time consisted of the operators’ contracts, the formulas, and $500 in cash. Lloyd B. Cornell, a witness with 25 years experience in various phases of the coal business, retrospectively appraised the contracts as worth approximately $150,000 each on March 9, 1917. Alfred Hawke, a witness having about 15 years experience in the coal business, retrospectively appraised the contracts as having a value between $275,000 and $300,000 on March 9, 1917.
The petitioner has offered the contracts with the Cayuga Power Corporation and Wickwire Brothers, together with testimony of its witnesses, to establish the fair market value per ton to consumers, of Bernice screenings on March 9, 1917. The respondent in rebuttal has attempted to establish the fair market value of comparable sizes of anthracite. We believe that the fair market value of the coal covered by the contracts involved was not less than $3 per ton on March 9, 1917. This is material to our determination of the value of the contracts.
The respondent’s brief is largely devoted to impugnment of the motives of the petitioner’s witnesses. We consider it to have more rhetorical interest than persuasiveness. So far as the petitioner fails to establish the maximum asserted value of the contracts, its failure is due to our belief that the opinions of value offered, two of which are admittedly retrospective, have been predicated upon incomplete or hazily recollected information. We think it clearly evi-’ dent however that the contracts had a considerable value, but we are unable on the whole record to determine that value with certainty. It is nevertheless our opinion that when acquired by the petitioner the contracts had such value that the stock issued for them was worth not less than its par value, which is $99,500. The petitioner is entitled to deductions for exhaustion of the contracts in annual amounts based upon this sum. Strong, Hewat & Co., 3. B. T. A. 1035, and East Market Street Hotel Co., 11 B. T. A. 796.
As there has been no allocation of value to the contracts individually, we believe that depreciation on the entire value allowed should be computed on the basis of the term last expiring, that is, on the term of the Northern Anthracite Company contract.
Petitioner assigned as error the Commissioner’s refusal to compute the profits tax for 1920 under the provisions of section 328 of the Bevehue Act of 1918. By agreement of counsel, hearing upon this *705 issue was postponed until the determination by the Board upon other issues relating to that year. Our determination in respect of other issues as to 1920 may have the effect of eliminating the claim that upon the basis of the Commissioner’s determination there were abnormalities for that year which entitled petitioner to a determination of its profits tax under section 328. The parties are therefore directed to file a computation of the tax liábility for the years 1920, 1922, and 1923, in accordance with the determination herein, and if the petitioner desires and so moves, further hearing will be had upon the issue as to the abnormality for 1920. Otherwise judgment will be entered holding the deficiency for 1918 barred by the statute of limitation and judgment as to 1920, 1922, and 1923, will be entered under Rule 50.